No. 15-1915

In the

# United States Court of Appeals
## For the Federal Circuit

———————————

Reloaded Games, Inc., *Appellant,*

v.

Parallel Networks, LLC, *Appellee,*

———————————

On Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board, in Case No. IPR2014-00136

———————————

**BRIEF OF APPELLEE**

———————————

Darren W.  Collins
Aaron J. Pickell
McGuireWoods LLP
2000 McKinney Avenue
Suite 1400
Dallas, Texas 75201
(T) (214) 932-6405
(F) (214) 932-6499
*dwcollins@mcguirewoods.com*
*apickell@mcguirewoods.com*

Matthew Allen Fitzgerald
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
(T) (804) 775-4716
(F) (804) 698-2251
*mfitzgerald@mcguirewoods.com*

December 23, 2015

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Reloaded Games, Inc.     **v.**     Parallel Networks, LLC

Case No.     15-1915

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) appellee, Parallel Networks, LLC. certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

Parallel Networks, LLC

2. The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3. below) represented by me is:

Parallel Networks, LLC

3. All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below. (Please list each party or amicus curiae represented with the parent or publicly held company that owns 10 percent or more so they are distinguished separately.)

None.

4. ☐ The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Robert C. Hilton
McGuireWoods LLP

12/23/2015     /s/ Darren W. Collins
Date     Signature of counsel

Please Note: All questions must be answered

Darren W. Collins

cc:     Printed name of counsel

Reset Fields

# TABLE OF CONTENTS

TABLE OF CITATIONS ..................................................................................... ii

STATEMENT OF RELATED CASES ................................................................ 1

STATEMENT OF THE CASE ............................................................................. 2

A.    Prior Art and U.S. Patent No. 7,188,145 ........................................ 2

    1.    Smith ........................................................................................ 2

    2.    Inohara ..................................................................................... 2

    3.    The '145 Patent ..................................................................... 9

B.    History of the Proceedings ................................................................. 10

SUMMARY OF THE ARGUMENT .................................................................. 13

ARGUMENT .................................................................................................... 15

A.    Standard of Review .......................................................................... 15

B.    Inohara does not teach "allowing a client to join a cache
community" ...................................................................................... 16

    1.    Substantial evidence supports the Board's determination
that Inohara's relevant "cache community" is its hierarchy,
not individual server groups ............................................... 17

        a.    The Board's determination ...................................... 17

        b.    Reloaded's arguments ............................................. 21

    2.    The Board correctly applied the broadest reasonable
interpretation of "cache community" .................................. 24

C.    The Board did not err in finding claims 29-34 and 36 valid. ......... 27

D.    Substantial evidence supports the Board's decision that the
combination of Smith and Inohara did not teach "allowing a
client to join a cache community" ................................................... 29

CONCLUSION .................................................................................................. 33

STATEMENT REGARDING ORAL ARGUMENT ........................................... 33

CERTIFICATE OF COMPLIANCE ................................................................. 35

CERTIFICATE OF SERVICE ........................................................................... 36

## TABLE OF CITATIONS

**Cases**                                                                      **Pages**

*Belden Inc. v. Berk-Tek LLC*,
   805 F.3d 1064 (Fed. Cir. 2015) .................................................................. 15, 29

*Dayco Products, Inc. v. Total Containment, Inc.*,
   329 F.3d 1358 (Fed. Cir. 2003) ...........................................................................28

*In re Kotzab*,
   217 F.3d 1365 (Fed. Cir. 2000) ...........................................................................15

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007)...........................................................................................32

*Randall Mfg. v. Rea*,
   733 F.3d 1355 (Fed. Cir. 2013) ...........................................................................15

# STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, counsel for Appellee, Parallel Networks, LLC, states as follows:

(a) No other appeal in or from the same proceeding was previously before this or any other appellate court whether under the same or a similar title; and

(b) U.S. Patent No. 7,188,145 ("the '145 Patent") is the subject of at least the following litigations currently pending before the United States District Court for the District of Delaware: *Parallel Networks, LLC v. KOG Games, Inc.*, 1:13-cv-178-RGA, *Parallel Networks, LLC v. Riot Games, Inc.*, 1:13-cv-183-RGA, *Parallel Networks, LLC v. Turbine, Inc.*, 1:13-cv-184-RGA, *Parallel Networks, LLC v. Blizzard Entertainment, Inc.*, 1:13-cv-826-RGA, *Parallel Networks, LLC v. Reloaded Games, Inc.*, 1:13-cv-827-RGA, *Parallel Networks, LLC v. SG Interactive, Inc.*, 1:13-cv-187-RGA, and *Parallel Networks, LLC v. Kollective Technology, Inc.*, 1:13-cv-914-RGA.

Other than the aforementioned cases, there are no other cases known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the Appeal.

## STATEMENT OF THE CASE

### A.    Prior Art and U.S. Patent No. 7,188,145

#### 1.    Smith

U.S. Patent No. 6,341,311 ("Smith") discloses a distributed proxy server array.  Smith does not disclose any process for allowing proxy servers to be admitted to the array, noting only that many different implementations for adding such proxy servers could be envisioned.  A160, 18:50-53.

#### 2.    Inohara

At the heart of this appeal are the Board's factual determinations about the teachings of Inohara.  Accordingly, the scope and content of Inohara are critical to understanding the Board's determination of non-obviousness.  This section is necessary under Fed. Cir. R. 28(b) because Appellant Reloaded Games ("Reloaded") provided a too-narrow description of Inohara.

Inohara discloses a hierarchical cache structure intended for use with large networks.  Inohara's structure aims to overcome the size limitations of previous cache architectures.  More particularly, the cache architecture proposed by Inohara overcomes a significant administrative burden in adding new cache servers to a large network.  See A176, 1:41-44.  Solving such problems removes the size limitations of previous caching systems and enables the cache architecture of

Inohara to work for large scale networks like "the Internet with an enormous number of machines connected." A177, 3:29-31.

Inohara describes a process in which all servers requesting to participate in the described system are added to a single distributed cache hierarchy by an algorithm that determines an appropriate location for each server in the hierarchy. A170, FIG. 4; A180, 9:17-10:36. The cache hierarchy disclosed by Inohara works "even in the case where the number of servers becomes very large," making it suitable for use in connection with the "explosive growth of the Internet." A177, 4:20-22; A176, 1:46-49.

Inohara describes a hierarchical cache structure that works by caching content at server groups forming branches of a hierarchical tree structure. See A241-42. In the hierarchical cache structure, "a server at a tier of a server tree (such as upper leader server 234 in Figure 2 of Inohara or server A of Diagram A) forms a group with each of its branch or leaf servers (such as servers 232, 232' and 232'' in Figure 2 of Inohara or servers B and C of Diagram A), which are each logically organized under such server." A289; *see* A168, Figure 2; A179, 7:58-64; A241-42. A server from the group may obtain content by accessing content cached by other servers in the hierarchy by interacting with a higher or lower tier server. For example, server 234 would form its own branch or leaf with servers

3

234' and 234'' and its own leader.  As shown in Diagram A, server A forms its

own branch or leaf with server D and its own leader X.  A289; A241-42.

Only a subset of the cached content is stored at each group of servers in a

multi-group configuration, thereby requiring each group to form a common

caching hierarchy with the other groups in order to access all cached content

according to the teachings of Inohara.  See, e.g., A178, 6:48-53; A184, 17:1-19,

17:46-48; and A179, 8:14-24 (showing that Inohara employs a "cache movement"

process that allocates cached content to servers in other groups by describing a

"cache movement  . . . similar to . . . circulation of the hierarchy maintenance

message."  The hierarchy maintenance message is described as being circulated

"over a plurality of groups.").

Inohara describes its cache hierarchy as "mutual[ly] support[ing]" and as

including "groups of a tree structure formed by server groups."  A177, 4:4-

9.  Inohara does not function by allocating cached content across an individual

server group.  Instead, Inohara discloses a "'wide-area cooperative cache

management protocol'. . . [that] performs the propagation of a cache directory (a

list of URL's and servers which hold the URL's in caches) using the multi-cast

hierarchy formed by the above-mentioned server status propagation protocol and a

cache control."  A177, 4:23-32.  As taught by Inohara, the multi-cast hierarchy

allows a larger caching community to be structured than would be possible if

4

single caching groups were utilized with no hierarchical structure. *See* A181, 11:39-42; A177, 3:48-50; *see also* A241-42.

In Inohara, the term "group" consistently denotes a subset of the hierarchical cache system and not a stand-alone cache system. *See*, *e.g.*, A179, 7:46-64; A181, 11:39-42; A182, 14:21-33. For example, Inohara states that "[t]he multi-cast hierarchy includes groups of a tree structure formed by server groups" in which servers may request and be granted membership in the group in accordance with the process shown in FIG. 5. A177, 4:5-6; A171, FIG. 5. Inohara, however, also teaches that each server and each server group in the multi-cast hierarchy participates in the common cache management protocol (the multi-cast hierarchy) as a whole. A182, 14:46-53. Put simply, Inohara combines server groups to form a single caching system identity that consists of multiple server groups included in a single hierarchical structure.

Figure 5 of Inohara describes how servers are added to individual server groups and how such server groups are organized relative to one another in the overall caching hierarchy. Inohara does consider the size of an individual server group in determining whether to add new servers as leaves within the server group and to reorganize the group relative to such new servers and the overall hierarchy. More particularly, if the size of a server group would exceed a maximum number by simply adding one or more new servers to the server group,

the server group reorganizes into sub-groups.  *See* A243 (explaining this).   As

Inohara describes, if "'the judgment [. . .] of whether or not the sum of the number

of old members and the number of new members is smaller than MAX'" yields a

negative result, the group is reorganized in either steps 514 and 515 or 518 and 519

to include the server.  A217; A171; A181, 11:6-42.

The maximum server group sizes do not exist to limit the number of servers

participating in the cache hierarchy as a whole or even the individual server

group.  Size limits exist to most efficiently organize the cache tree to limit the

amount of communications required of any group leader.  See A243-A244.  By

separating a single group into overlapping sub-groups, communications are

reduced substantially.  For example, in Diagram A at A242, if servers A through F

were organized in a single group under leader X without any sub-groups, leader X

would have to communicate with each of servers A through F.  Through the use of

sub-groups arranged as illustrated in Diagram A, leader X need only communicate

with servers A and D.  The communications savings increases exponentially as the

number of servers increases.

Figure 5 of Inohara describes the process for admitting new servers into a

server group.  A171.  There are three scenarios.  *See* A244.  Under the first

scenario, if admitting the new servers would not cause the server group to exceed

the previously discussed maximum number (hereafter MAX), then no

reorganization is needed and no sub-groups are created in the server group. A180, 10:60-66. The first scenario is illustrated by Diagram B at A246.

Under the second scenario, described by steps 514 and 515 of Figure 5, the addition of all new servers would cause the server group to exceed MAX but at least one of them could be admitted without exceeding MAX. A181, 11:6-17. The server group then reorganizes into sub-groups. This reorganization places the first of the new servers into a subgroup with the existing members of the server group. A181, 11:6-17; *see also* A244-45. A second lower tier sub-group is formed with the first of the new servers and the other new servers. A244-45. The first of the new servers is designated as the leader of the second sub-group and forms a node on which the first and second sub-groups overlap. *Id.* Thus, in steps 514 and 515, the previously existing group remains in the exact same position in the cache hierarchy but becomes two sub-groups, with one upper tier sub-group overlapping with one lower tier sub-group in a manner to cooperate with each other (and with the rest of the multi-cast hierarchy of Inohara) to cache and share content. The second scenario is illustrated by Diagram C at A247.

Under the third scenario described by steps 518 and 519 of Figure 5, the addition of even one new server would cause the server group to exceed MAX members. A181, 11:17-42. Like the second scenario, the server group reorganizes into sub-groups. *Id.* This scenario places the existing leader of the existing server

group into a first sub-group with a second existing server and the first new server, led by the existing leader. *Id*. The other existing servers are placed into a second sub-group with the second existing server, led by the second existing server. *Id*. The other new servers are place into a third sub-group with the first new server, led by the first new server. *Id.* Thus, in steps 518 and 519, one previously existing group is reorganized into three sub-groups, with one upper tier group and two lower tier groups, such that all groups are part of the same cache community and cooperate together (and with the rest of the caching hierarchy) to cache and share data. *Id*. The third scenario is illustrated by Diagram D. A248.

Importantly, in all three scenarios, all of the new servers are accepted into the existing server group, which may now have been sub-divided into two or more groups. All of such new servers are linked with and interact with all of the previous members of the server group. There is no potential for refusal to grant entrance to the server group or the cache community. *See* A249-51.

Inohara teaches that the dynamic nature of organizing and reorganizing groups as the numbers of servers within such groups change allows the groups to share cached data as a single caching hierarchy. A248. More particularly, Inohara states that, "[w]ith the foregoing operation, it becomes possible to make hierarchization corresponding to a dynamic increase in the number of servers while the maximum number of members in each group is kept equal to or smaller than

8

MAX." A181, 11:39-42. Inohara even notes that the purpose of arranging the servers into groups is to manage administrative communications within a large caching hierarchy. A182, 14:21-33; A248-49. Utilizing the disclosed branched hierarchy of interconnected server groups therefore allows Inohara to achieve the advantages of having a single caching hierarchy that is fully scalable with a "very large" number of servers without the size limitations found in prior art caching systems. *See* A177, 4:10-22, 3:34-40, 3:48-50, 4:23-32; *see also* A241-42.

Looking beyond the individual group formation, the overall hierarchical formation of the cache community of Inohara is described with regard to FIGS. 4 and 7 of Inohara (construction and reconstruction). Neither process includes any determination as to whether to admit a server or server group to the hierarchy. *See* A178, 5:12-19; A180, 9:10-10:36; A182, 13:64-14:40. Instead, the process of Inohara determines how to organize the new server within the hierarchy. See A180-81, 10:37-11:37. Thus, Inohara only makes a determination of where in a cache community a server should be logically located. See A250-51.

### 3.    The '145 Patent

U.S Patent No. 7,188,145 (the "'145 Patent") discloses a system and method for dynamic distributed data caching using a cache community. A32, Abstract. The cache community includes peers that cooperate to cache content. A46, 3:13-26. When a client joins a cache community, a peer list is updated to include that

client and content stored by the cache community is re-allocated among the peers. A46, 3:22-25. Certain claims of the '145 Patent recite "allowing a client to join the cache community" or "determining whether to allow the client to join the cache community." A58, 28:57, A59, 29:2-3. Other claims of the '145 Patent recite "receiving a community list" and "selecting one of the communities to attempt to join." A69. The '145 Patent teaches that a client may be denied entry into a cache community. For example, if no communities allow a particular client to enter their communities, a cache module may attempt start its own community. A51, 13:33-36.

## B.    History of the Proceedings

Under Federal Circuit Rule 28(b), Parallel limits its discussion here to a short summary of the proceedings that includes a few important aspects of this case not fully recited by Reloaded.

Parallel filed a civil action against Reloaded for infringement of the '145 Patent on May 9, 2013, based on the sale by Reloaded of certain video games. Parallel alleged that the downloading and use of those video games performed the distributed data caching claimed by the '145 Patent. In response, Reloaded filed an IPR Petition challenging all claims of the '145 Patent. Parallel filed a preliminary response. The Patent Trial & Appeals Board ("the Board") issued a written Decision on Institution on May 16, 2014.

In the Decision on Institution, the Board focused on the limitation "allowing a client to join the cache community" of independent claim 1, the limitation "determining whether to allow the client to join the cache community" of dependent claims 2 and 16, and the limitations of "receiving a community list" and "selecting one of the communities to attempt to join" of independent claims 29, 32, and 36. A193-215. In connection with the limitations of claims 1 and 2, the Board construed the term "allowing" as "to permit the presence of" using a dictionary definition, which the Board held necessarily includes the possibility that entry may be denied. A200-02. The Board also construed the term "community" as including "similarity or identity" or "sharing, participation, and fellowship," again using a dictionary definition. A199-200.

Based on its construction of "allowing," the Board determined that Smith did not disclose "allowing a client to join the cache community." A211. Accordingly, the Board declined to institute a review of claims 1, 8, 9, 11-15, 22, 23, and 25-28. A211-12. However, the Board instituted a proceeding on claims 2-4, 6, 7, 10, 16-18, 20, 21, 24, and 29-36 of the '145 Patent to consider the obviousness of such claims under the combination of Smith and Inohara. A227.

On September 30, 2014, Parallel filed its Patent Owner Response, referencing the affidavit of Parallel's expert witness Dr. Mitchell Thornton. Parallel argued that Inohara did not teach allowing a client to join a cache

11

community because (1) allowing was construed by the Board as including the possibility of denial; and (2) Inohara does not teach that a server is ever denied entry to the cache hierarchy that is the community of Inohara. A299. Parallel relied on the text of Inohara and on the affidavit of Dr. Thornton.

The majority of Dr. Thornton's affidavit focused on a description of hierarchical and cooperative cache structures and, in particular, on an explanation of the cooperative cache hierarchy described by Inohara. According to Dr. Thornton, Inohara addressed a need at the time for a scalable cache system that could operate with networks as large as the Internet. A241. Inohara met such need using a dynamically structured multi-cast hierarchy that includes many groups of servers arranged in an overlapping tree structure, each having a leader that in turn serves as a member of a higher level group. *Id*. The result is an infinitely extendable caching network. A242. The benefit of such a structure is the ability to always accept additional servers to grow the cache system. As Dr. Thornton noted, even if including a server in one of the individual server groups that make up the hierarchy would cause it to become too large, Inohara still accommodates the new server by reorganizing the server group into sub-groups. A250.

On October 31, 2014, Reloaded filed its Reply. Reloaded argued that the individual server groups of Inohara are cache communities, and that the

12

reorganization of such a server group when they hit their maximum size meant that a new server was being "denied" entry into a cache community.  A321, A324.

After oral argument, the Board issued its Final Written Decision on May 14, 2015 (the "Final Decision").  In the Final Decision, the Board determined that the combination of Smith and Inohara did not teach "allowing a client to join the cache community", "determining whether to allow the client to join the cache community", "receiving a community list", or "selecting one of the communities to join."  According to the Board, Inohara taught that in all instances a requesting server was permitted to join the overall cache hierarchy of Inohara, and that the teachings of Inohara relative to restructuring a server group when it reaches a maximum size does not mean Inohara teaches denying entrance to the cache community.  A24-25.  The Board also held that Inohara does not disclose a list of communities but instead taught the formation of a community consisting of an overall hierarchy of servers in groups.  A29.

Reloaded timely filed a notice of appeal.

## SUMMARY OF THE ARGUMENT

Reloaded argues that the Board was wrong in concluding that the combination of Smith and Inohara does not teach "allowing a client to join the cache community" or "determining whether to allow the client to join the cache community."  Opening Br. 5-6.  Reloaded does not contend that the Board's

13

construction of either of the terms "allowing" or "community" is incorrect. In each of the grounds for Appeal, Reloaded asserts that the Board reached the wrong factual determinations regarding the scope and content of the prior art of Smith and Inohara. As noted by Reloaded, the standard of review for errors in factual determinations is whether or not the Board had substantial evidence in reaching such factual determinations. *Id.* at 15.

In discussing the grounds of Appeal, Reloaded takes the extreme position that findings of the Board were completely unsupported, contained no analysis, and that the Board did not cite to Inohara, to the parties' briefing, or to any other factual support. *Id.* at 17, 25. However, Reloaded's position is at worst completely inaccurate or at best one of semantics. Reloaded appears to be taking the position that if a sentence containing a conclusion of the Board does not cite to the record within that same sentence, then such conclusion is completely unsupported and the Board is pulling the conclusion out of thin air. That is simply not the case. In each and every instance, the conclusion of the Board is immediately preceded by pages of the Final Written Decision in which the Board does cite to the parties' briefing and to extensive factual support. In fact, the Board conducts a thorough analysis of the factual evidence, in some cases even exploring grounds of analysis that were not expressly advanced by the parties but were nevertheless included in the scope and content of the prior art.

14

# ARGUMENT

## A.    Standard of Review

The Board held that Smith and Inohara did not make the claims of the '145 Patent obvious.  That was a legal conclusion about obviousness.  But Board decisions about obviousness are "based on factual determinations regarding the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the art, and the motivations to modify or combine art, and any other objective indicia of non-obviousness."  *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) (citing *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013)).   Such underlying factual determinations are reviewed deferentially, under a "substantial evidence" standard.  *Id.*

This appeal centers on those underlying "factual determinations" by the Board "regarding the scope and content" of Inohara and "differences between the prior art and claims at issue."  *Randall Mfg.*, 733 F.3d at 1362.  Accordingly, as Reloaded concedes, the standard of review is deferential.  Opening Br. 15.  Specifically, "if a reasonable mind might accept the evidence as adequate to support the factual conclusions drawn by the Board, then we must uphold the Board's determination."  *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000).[1]  The

---

[1] Reloaded then argues that "a preponderance of evidence shows that Inohara teaches 'allowing a client to join a cache community.'"  Opening Br. 17.  That

proper inquiry here is whether the Board acted *reasonably* in finding facts and agreeing with Parallel's expert testimony about the meaning and teaching of Inohara and Smith.

**B.    Inohara does not teach "allowing a client to join a cache community."**

A central issue presented to the Board was whether "Inohara teaches or suggests 'determining whether to allow the client to join the cache community,' as recited by claim 2 and 'allowing a client to join the cache community,' as recited by claim 1."  A26.  The Board held that the proper view of a "cache community" in Inohara meant its entire system, and that Inohara created a method for universally including servers in that system.  Because of such principle of universal inclusion, Inohara did not teach "whether to allow [a] client to join [its] cache community." *Id.*  For the same reason, Inohara did not teach "allowing a client to join the cache community," because, as all parties have agreed, "allowing" inherently subsumes a decision about *whether* to include, not simply how.

The Board's findings about Inohara were correct.  Even beyond that, the Board based its findings on an analysis of Inohara and on comprehensive expert testimony from Parallel's expert.  The Board's findings about Inohara comfortably satisfy the deferential "substantial evidence" standard.

---

misstates the standard, which Reloaded elsewhere admits requires "'less than the weight of evidence'" to affirm the Board.  *Id.* at 16; *see Kotzab*, 217 F.3d at 1369.

16

Several undisputed definitions by the Board stand at the center of this issue. In its initial order, the Board defined "community."  A200.  Using the dictionary, the Board ruled that "community" means "similarity or identity" or "sharing, participation, and fellowship."  A24, A200.  A "cache community" is then computers with such similarity, sharing, participation, and fellowship based on sharing cached information.

The Board also defined "allowing."  A201.  Again properly using the dictionary, the Board defined "allowing" as "to permit the presence of."  *Id.*  This definition by necessity includes the possibility that entry may be denied.  *Id.* (citing Reloaded's petition as stating that key to "allowing" entry is "evaluat[ing] a join request to determine whether the client will be allowed to join"); A202 ("Reloaded Games argues that the client joins a cache community through an evaluation of a join request and a decision based on that evaluation, which is consistent with our construction of 'allow' and 'allowing.'").

Reloaded does not challenge any of these (broad) definitions.

**1.    Substantial evidence supports the Board's determination that Inohara's relevant "cache community" is its hierarchy, not individual server groups.**

### a. The Board's determination.

Applying its uncontested definition of "community," the Board decided, as a factual matter, that Inohara's relevant "cache community" is its complete caching

hierarchy and not any individual server group. A25 ("Therefore, we determine the multi-cast hierarchy of Inohara to be the 'community' because the servers of the hierarchy have 'similarity or identity' and 'sharing, participation, and fellowship' pertaining to cache provision."); A26 ("we determine that Inohara's hierarchy . . . is the relevant 'community' for our analysis").

Reloaded argues that the Board's finding lacked any factual support. Opening Br. 17 (urging that the Board's holding was "unsupported. . . [and] did not cite to Inohara, to the parties' briefing, or any other factual support."). That is not the case. Six pages of the Board's order carefully lay out the parties' arguments, cite repeatedly to Inohara and to expert testimony about it, and select Parallel's arguments as the best interpretation of Inohara. *See* A20-26.

Inohara's relevant "cache community" is its entire hierarchy because Inohara's basic principle is system-wide inclusion—"sharing, participation, and fellowship." As Parallel's expert Dr. Thornton told the Board, the entire purpose of Inohara is to provide a unified caching system that is infinitely scalable for large networks such as the Internet. A242. That is, Inohara does not *exclude* any new servers—it self-organizes and restructures its hierarchy to accommodate all new attempts to join.

As Dr. Thornton noted, "In all cases, a server seeking to join the cache hierarchy of Inohara is admitted into the tree hierarchy that serves as the cache

system of Inohara and is operable to share content with all other servers in the hierarchy." A249. Specifically, "[i]n all of the scenarios described in Inohara where servers seek to be added to the hierarchy, all servers requesting membership in the cache system are admitted, assigned a position within the caching hierarchy, and cooperate to share cached content with the cache hierarchy." *Id.* The Board's decision cites repeatedly to Dr. Thornton's affidavit. A21-22 (citing Thornton's affidavit; A241-50 (Ex. 2002)).

In other words, Inohara's server groups are not separate "cache communities." The Board correctly—and certainly reasonably—took the view that individual server groups are parts of a unified whole. They are building blocks of one hierarchy; branches of the same tree.

The server groups do not exclude new members. Instead, they subdivide, making more groups to accommodate all. The groups then act in concert to share cached data, communicating efficiently through leaders that are members of two groups. The groups' cache directories are shared and accessible between groups.

To satisfy itself on this point, the Board specifically analyzed the most exclusionary-type setup envisioned by Inohara. In that case, the cache hierarchy of Inohara consists of only a single "full" server group. The "full" server group is presented with a request to join from a new additional server. A25-26. Even in the instance where the cache hierarchy of Inohara is but a single group, the "full"

server group does not reject the additional server. Instead, the server group subdivides into an upper group and a lower group to make room for the new server A25 (citing A181, Inohara 11:18-42).

Each group includes members of the original "full" server group. A181, Inohara 11:18-42. The lower group branches off from the higher group. Id. The lower level group has a leader, which is in turn a member of the higher level group, through which to efficiently propagate communications between the two groups. A181, Inohara 11:18-42; A25. Because the higher and lower level groups in Inohara overlap, the new group members may communicate fully with all information cached in the old group. In that way, the new server "still would participate in providing a cache as part of the hierarchy." A25. This is very different from the teachings of the '145 Patent, where a server is truly denied entrance to a cache community and must start its own community anew and apart from the cache community to which such server sought admittance. A51, 13:33-36. So, the Board concluded, the new server should be considered part of the same "cache community."

Inohara does not teach excluding additional servers, even when an original server group is full. Instead, the additional server still actively participates in the caching functionality performed by the original group. Thus, the Board reasonably

found that "we determine that Inohara's hierarchy (first group and one server not allowed to join) is the relevant 'community' for our analysis." A26.

The Board then aptly concluded that Reloaded "ha[d] not shown by a preponderance of the evidence that Inohara teaches or suggests 'determining whether to allow the client to join the cache community,' as recited by claim 2 or 'allowing a client to join the cache community,' as recited by claim 1, from which claims 2-4, 6, 7, and 10 depend." A26. The Board's finding was correct, and comfortably satisfies the deferential "substantial evidence" standard.

### b. Reloaded's arguments.

Beyond arguing that no evidence supports the Board's finding—a claim contradicted by six pages of the Board's order and refuted above—Reloaded makes only one other argument on this point. Reloaded contends that Inohara teaches limiting the propagation of a cache directory to an individual server group. Opening Br. 18-19. That is not the case.

As a threshold matter, this argument does not appear to attack much of the Board's reasoning or citations laid out in its decision. A20-26. That is, even if Reloaded were right, substantial evidence would still exist to support the Board's finding, and it should be affirmed. For example, the Board's found that a server in Inohara seeking to join a cache hierarchy consisting of a single server group works with such server group and becomes part of that cache hierarchy even if the single

21

server group was already at a maximum size.  A26.  Regardless, Reloaded is not correct.

Clearly, Inohara *does* contemplate propagating a cache directory beyond each single server group.  In fact, immediately before correctly holding that "Inohara does not disclose limiting the propagation of the cache directory to within a server group," the Board cited Inohara itself.  A25.  At that citation, Inohara states that a "'wide-area cooperative cache management protocol . . . performs the propagation of a cache directory' . . . using the multi-cast hierarchy . . . without needing a centrally managing server."  A177, 4:23-32 (cited at A25).  The Board also states that Inohara describes a distributed server environment in which servers can share the contents of their caches through a cache directory.  A25 (citing A176, 1:8-15, A177, 4:23-32, A180, 9:16-10:36).  On its face, Inohara describes cache directories moving across the hierarchy beyond a single server group.

In short, Inohara does not state that cache directories are not forwarded outside of a server group.  Inohara could not function if cache directories were limited to within a server group.  If that were true, there would be no propagation of directories or movement of cached content between branches of the tree.  There would be no use for the careful system of leaders in overlapping groups and relays.

In attempting to craft a different vision of Inohara, Reloaded uses carefully selected snippets of it that avoid mention of the hierarchical structure.  Opening Br.

18-19.  In doing so, Reloaded attempts to narrowly describe the updating of a cache directory taking place within a single server group.  *Id.*

Reloaded's description misses the point.  By definition, in a hierarchical tree like Inohara, when one server updates a cache directory by sending a new cache entry to the other servers that compose that group, such new cache entry is inherently sent to servers that are also part of other groups.  Those servers in turn update the members of the other groups to which they belong.  Consistent with this, nowhere in the section entitled Search of Cache and Propagation of Cache Directory, A182, the description of Figures 1 or 2, A167-68, or elsewhere, does Inohara indicate that a cache directory is not forwarded to any servers outside of the immediate group.

Inohara illustrates this.  The components referenced by Reloaded are the components of Figures 1 and 2 that describe the cache-related components of an individual server.  A182-83.  That server's "group" is the members of group table 110, which appears in both Figure 1 and Figure 2.  A179, 7:46-54.  In Figure 2, the group table 110 illustrates that servers participate in more than one group.  *Id.* Inohara states that "group table 110 is a table which holds some proximate server groups."  *Id.*  If server 10 is a member of more than one group (for example, the leader of a lower level group and a member of an overlapping higher level group)

as described by Inohara, it stands to reason that server 10 would need to update both groups as to its cache directory.  *Id.*

To remove any doubt, Inohara goes on to state that "in performing multi-cast communication between the groups, the leader acts as a relay for that communication," necessitating the need to include members of both sets of members in the "group table."  *Id.* at 7:54-64.  Both the portions of Inohara cited above and the existence and membership of group table 110 clearly suggest that the cache directory is propagated between proximate groups consistent with a hierarchical cache system.

## 2. The Board correctly applied the broadest reasonable interpretation of "cache community."

Reloaded argues that, under a "broadest reasonable interpretation" standard, the *only reasonable* conclusion the Board could reach was that individual server groups in Inohara qualify as "cache communities."  Opening Br. 20-22.  That is not the case.

First, Reloaded attacks a straw man.  The Board held that in Inohara, the entire hierarchy was the relevant "cache community," not the individual server groups.  A25.  Reloaded urges that "[t]his conclusion necessarily assumed that the Challenged Claims required or permitted only one 'cache community' in a caching system."  Opening Br. 20.

No such assumption occurred.  Nowhere did the Board state or appear to assume any requirement of the claims of the '145 Patent that there only be a single cache community.  The Decision on Institution does not state this.  Nor does the Final Written Decision.  The Board did not mention any such requirement at trial.  The entire support Reloaded offers for its theory that the Board made such an assumption is the sole word: "the" before "cache community" in a single sentence of the decision.  A25.  Yet even the claim language at issue uses the term "the cache community."  A58, 28:57.  A single use of the word "the" is far too thin a reed to support Reloaded's theory.  Moreover, the Board clarified this on the very next page by stating that "we determine that Inohara's hierarchy . . . is the *relevant* community for our analysis."  A26 (emphasis added).  That reflects an exercise of judgment by the Board about what to consider a "community," not an unsupported, imaginary, false assumption that there could only ever be one such entity.

Straw man aside, the Board's judgment was that, under a broadest reasonable application of the term "cache community," Inohara's entire hierarchy is such a community.  Its individual server groups are not.  In short, the server groups are interconnected and readily, efficiently share cached information amongst themselves.  And the same servers can be members of multiple layers of server groups.  For these reasons, *all* servers in Inohara share "similarity or identity, or sharing, participation, and fellowship" as to the sharing of cached

information.  The Board's evident judgment was that a "cache community" should not distinguish among the layered, overlapping server groups, and instead would include all servers as one "community."

The real question was whether Inohara teaches the overall limitation of denying a server entrance into a cache community.  The Board considered Reloaded's argument, which amounted to artificially constraining the boundaries of a cache community of Inohara down to a single building block of that community, and then arguing that a server not being placed into a specific building block teaches denial of entry into a cache community.  The Board concluded that Reloaded's argument was not a fair determination of whether Inohara teaches such a denial.  Instead, the Board determined that Inohara's basic principle – inclusion – means that a proper reading of "cache community" means *all* of Inohara.  Thus, Inohara does not teach denying a server entrance into a cache community.

However, even at the level of individual server groups, the groups of Inohara do not meaningfully reject additional servers trying to join.  Instead of saying 'no' to the new joiner, full groups subdivide toward the specific goal of universal cache sharing in an efficient manner.  A181, 11:18-42.  Inohara's decision not to place an additional server into a particular individual server group is really just a decision to rearrange the individual server group into multiple overlapping groups in order to

accommodate and incorporate the additional server. That is not a denial of permission to join, but a rearrangement of the cache hierarchy.

As Dr. Thornton noted, Inohara teaches the opposite of exclusion: it provides a framework for a caching architecture that had no size limitations and had an overriding principle of inclusion. A250. This inherently suggests, as the Board held, that Inohara is one big cache community, not an infinite number of separate cache communities.

## C.    The Board did not err in finding claims 29-34 and 36 valid.

Claim 29 recites "A method for dynamic distributed data caching comprising. . . receiving a community list . . . including a list of communities" and "selecting one of the communities to attempt to join." A193. The Board held that Inohara's cache hierarchy is one large community for providing a cache. The Board held that the individual server groups are not separate communities. Inohara discloses but a single cache community. There is no list of communities. There are not multiple communities to select from. The Board thus correctly observed that its earlier holding about the proper scope of Inohara's "community" foreclosed Reloaded's view of claims 29-34 and 36.

Reloaded states that the Board erred by reaching its conclusion "without discussing the actual claim limitations" and without analyzing the "actual claim language" thereof. Opening Br. 1-2, 25. Once again, that is not the case.

27

The Board spent seven pages of the Final Written Decision analyzing the community of Inohara as compared to other claims of the '145 Patent. A20-27. The Board used an additional three pages analyzing specific language in claims 29-34 and 36, such as the "community list."

The Board did not buy Reloaded's conjecture that group tables are community lists merely because they list multiple server groups. The Board cited Dr. Thornton's testimony that Inohara does not disclose multiple cache communities to select from, as it only includes a single cache that self-organizes itself into server groups. The Board also noted Parallel's argument that Inohara results in a server being assigned to a group or location, not in a server selecting a cache community from a list of cache communities. After such additional analysis, the Board concluded that the "group table" is not a "community list" because the cache community of Inohara is "its overall hierarchy of servers in groups." A29. Clearly, contrary to Reloaded's assertions, the Board considered the "actual claim limitations" and "actual claim language" in reaching its decision.

Reloaded cites *Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358 (Fed. Cir. 2003) to illustrate the Board's purported mistake. But in *Dayco*, the district court had rolled together and invalidated over 30 claims from four different patents. *Id.* at 1371. This Court observed that the district court's action ignored the differences between each individual claim, and reversed it. *Id.* Unlike

28

*Dayco*, the Board here specifically acknowledged claims 29-34 and 36 separately from the other claims.  It then spent several pages of its order relating the parties' arguments about these claims, including about "community lists" and "group tables"—points irrelevant to the earlier analysis.  A27-29.  The Board then concluded that its earlier findings logically foreclosed Reloaded's arguments. A29.  Nothing in *Dayco* suggests such an analysis is improper.

**D.    Substantial evidence supported the Board's decision that the combination of Smith and Inohara does not teach "allowing a client to join a cache community."**

The Board's decision has a clear basis.  First, the Board held that Smith does not teach "allowing a client to join the cache community."  A211 ("Smith does not describe that the proxy server to be added is allowed to join the proxy server array,"); A19.  Later, the Board also held that Inohara does not teach such a limitation.  A26 (after citing eight different portions of the specifications of Inohara, finding that "Inohara does not teach or suggest allowing a server to join its hierarchy.").

The Board aptly concluded that "based on our findings from Inohara, even if Smith were modified with the teachings of Inohara as asserted by [Reloaded], [Reloaded's] asserted combination does not teach or suggest the requirement of allowing a client to join a cache community."  A26.

29

Reloaded urges that the Board's holding somehow reflects the wrong "legal analysis." Opening Br. 28. According to Reloaded, properly viewed, the "preponderance of the evidence" supports its view that a combined Smith and Inohara *do* teach allowing a client to join a cache community. *Id.* But what Smith and Inohara say and teach, apart and together, to a person of ordinary skill in the art are fact questions, subject only to a deferential "substantial evidence" standard. *Belden Inc.*, 805 F.3d at 1073. That standard is met here.

Substantial evidence supporting the Board's view included negative inferences as to why the overall combination of Smith and Inohara do not teach "allowing a client to join the cache. . . community." For example, Dr. Thornton testified in his expert opinion that "Inohara's primary premise of design is that membership in a cache architecture should not be limited, and that Inohara cannot be combined with Smith to teach a determination of whether a server is to be allowed (or disallowed) entrance into a cache community." A241. According to Dr. Thornton, "[a]dding the possibility of denial of servers into the cache hierarchy of Inohara, based on size or otherwise, would render Inohara inoperable for its intended purpose of serving as a distributed caching system for the entire Internet." A251; *id.* ("[C]ombining Inohara with Smith for the purpose of Inohara teaching the concept of determining whether or not to allow a client to join the proxy-server based cache community of Smith would both render Inohara inoperable for its

30

intended purpose and be contrary to the express teachings of Inohara."). "There is no question that Inohara teaches *away* from a combination of Smith and Inohara to include a determination of allowing a client to join a cache community . . . in order to limit the size of the cache community in Smith." A252 (emphasis added).

The Board appears to have taken Dr. Thornton's testimony to heart in the Final Written Decision. The Final Written Decision cites key paragraphs of Dr. Thornton's testimony repeatedly. A2 (citing A230-55); A21 (citing A250-51); A21 (citing A241-42); A21 (citing A241-42, A243-44); A21 (citing A246-248, A250-51); A21 (citing A244-45, 246-47, 249-51); A21 (citing A250-51); A22 (citing A241-42); A22 (citing A250-51); A28 (citing A249-51). In particular, the Board cited Dr. Thornton's statement about Inohara that "[i]n such a manner, a multi-cast hierarchy can be infinitely extended to create extremely large caching networks, suitable for use with the Internet as described by Inohara" A21, A22 (citing and quoting Ex. 2002, ¶ 29, A241-42; A177, 4:14-22). A251. Five times, the Board cited Dr. Thornton's specific paragraph stating that "[a]dding the possibility of denial of servers into the cache hierarchy of Inohara, based on size or otherwise, would render Inohara inoperable for its intended purpose." A21-22 (citing Ex. 2002 ¶ 44 five times).

The Board's multiple citations demonstrate that it accepted Parallel's expert testimony that an exclusionary principle at the cache community level would not

naturally be combinable into Inohara.  The Board's finding that Inohara technically "allows" joining at the server-group level is not contrary to this.  A23.  Even at that level, the server groups do not determine whether to "allow" so much as re-organize and re-form into new overlapping groups that include the new server.  A181, 11:18-42.  Regardless, substantial evidence shows that "the overriding principle of Inohara is inclusion" in its cache community and a methodology for that universal inclusion.  A250.  Accordingly, substantial evidence supported the Board's view that a combination of Smith and Inohara "does not teach or suggest the requirement of allowing a client to join a cache community."  A26.

In a belated attempt to bring contrary evidence to balance the scales, Reloaded presents but a single statement to support its new "inference" theory.  More particularly, Reloaded cites its own expert, Dr. Danzig.  Dr. Danzig opined that it would be desirable to combine the two teachings of Smith and Inohara in order "to provide the functionality of allowing the caches to discover groups (communities) and to select one of which groups to join, as taught by Inohara."  Opening Br. 30 (citing A136).  But even Dr. Danzig did not state that he believed the combination of Smith and Inohara teaches allowing a client to join a cache community.  Nor did he suggest any inferential teachings of the two references.  Dr. Danzig merely stated what he thought Inohara taught.  As a result, Reloaded failed to provide evidence to the Board "of the inferences and creative steps that a

person of ordinary skill in the art would employ." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).

The Board could and did determine that the lengthy and detailed testimony of Dr. Thornton was more consistent with the scope and content of Inohara and more persuasive than a single, unclear statement of Dr. Danzig. Regardless, even disagreement by experts provides no ground for reversing the Board's decision. Parallel provided substantial evidence to support its view of Inohara and Smith, and the Board agreed.

## CONCLUSION

Parallel respectfully asks this Court to affirm the Board's decision. The Challenged Claims are not rendered obvious by Smith in view of Inohara.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant's contentions are not strong enough to warrant oral argument. The issue here boils down to whether substantial evidence supports the Board's decision, and it does. If the Court desires to hold oral argument, however, Parallel of course will participate.

Dated: December 23, 2015

Respectfully submitted,

/s/ *Darren W. Collins*
Darren W. Collins
Aaron J. Pickell
McGuireWoods LLP
2000 McKinney Avenue
Suite 1400
Dallas, Texas 75201
(T) (214) 932-6405
(F) (214) 932-6499
*dwcollins@mcguirewoods.com*
*apickell@mcguirewoods.com*

Matthew Allen Fitzgerald
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
(T) (804) 775-4716
(F) (804) 698-2251
*mfitzgerald@mcguirewoods.com*

*Counsel for Appellee Parallel Networks, LLC.*

FORM 19. Certificate of Compliance With Rule 32(a)

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.   This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☒ The brief contains  [*state the number of* ] 7,634  words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐ The brief uses a monospaced typeface and contains   [*state the number of* ] _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.   This brief complies with the or typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒ The brief has been prepared in a proportionally spaced typeface using

[*state name and version of word processing program* ] Microsoft Word 2010  in

[*state font size and name of type style* ] Times New Roman 14  , or

☐ The brief has been prepared in a monospaced typeface using

[*state name and version of word processing program* ] _____ with

[*state number of characters per inch and name of type style*] _____ .

/S/ Darren W. Collins
_____
(Signature of Attorney)

Darren W. Collins
_____
(Name of Attorney)

Appellee Parallel Networks, LLC
_____
(State whether representing appellant, appellee, etc.)

December 23, 2015
_____
(Date)

Reset Fields

FORM 30. Certificate of Service

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on    December 23, 2015
by:

      ☐ U.S. Mail

      ☐ Fax

      ☐ Hand

      ☒ Electronic Means (by E-mail or CM/ECF)

| Darren W. Collins | /s/ Darren W. Collins |
|---|---|
| Name of Counsel | Signature of Counsel |

| | |
|---|---|
| Law Firm | McGuireWoods LLP |
| Address | 2000 McKinney Avenue, Suite 1400 |
| City, State, Zip | Dallas, TX 75201 |
| Telephone Number | (214) 932-6405 |
| Fax Number | (214) 932-6499 |
| E-Mail Address | dwcollins@mcguirewoods.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields